IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| **JENNIE CHRISTENSEN** ) <br> ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> **HOWARD & HOWARD ATTORNEYS,** ) <br> **PLLC** ) <br> ) <br> ) <br> Defendant. ) | Case No.: 20CV05051 |

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

NOW COMES the Plaintiff, JENNIE CHRISTENSEN, by and through her attorneys, PATRICOSKI LAW OFFICES and for her **COMPLAINT AND JURY DEMAND,** alleges as follows:

**I.     INTRODUCTION**

1. While working as a Summer Associate with Howard & Howard in the summer of 2019, Plaintiff Jennie Christensen was subjected to sexual harassment and gender discrimination. Plaintiff Christensen was then terminated from her Summer Associate position and denied a full-time position in violation of Title VII of the Civil Rights Act of 1964, as amended.

**II.     PARTIES**

2. Plaintiff Christensen was a resident of the State of Illinois at the time her claims arose. Howard and Howard employed ms. Christensen as a Summer

Associate at the time of her termination and simultaneous wrongful denial of employment on 8/5/2019.

3. Defendant Howard & Howard Attorneys, PLLC is a Professional Limited Liability Company, with its principal place of business located in the State of Michigan and is registered in the State of Illinois with an office located in Chicago, Illinois.

### III. JURISDICTION AND VENUE

4. Jurisdiction is proper in this judicial district because Plaintiff Christensen is alleging violations of her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e).

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to Plaintiff Christensen's claims occurred within the jurisdiction of The United States District Court For The Northern District Of Illinois Eastern Division.

6. The United States Equal Employment Opportunity Commission has issued a Notice of Right to Sue, which was received by the Plaintiff on June 9th, 2020, a copy of which is attached to this complaint.

7. Plaintiff Jennie Christensen has complied with all administrative, jurisdictional, and legal prerequisites to the filing of this action.

## 8. GENERAL ALLEGATIONS

### A. Background

9. Plaintiff Jennie Christensen is a 24-year-old female who recently graduated from Notre Dame Law School.

10. On or about 7/24/2016, prior to committing to attend law school, Ms. Christensen contacted Scott Levin of Howard & Howard Attorneys, PLLC ("Howard & Howard"), to express her desire to meet and discuss a possible future career as an attorney. Shortly thereafter, Mr. Levin gave Ms. Christensen a tour of Howard & Howard's Chicago offices. Upon reviewing Ms. Christensen's pre-law school resume, Mr. Levin noted to colleague Phillip Crivellone, "[t]his is the resume for the remarkable young woman I mentioned to you. If we have any work opportunities that do not require law school training, I think she would be very worth considering."

11. During her first year of law school, Ms. Christensen sought and was granted an On-Campus Interview ("O.C.I.") with Howard & Howard.

12. Howard & Howard use the O.C.I.s as tools to identify and select Summer Associates for the following summer. Howard & Howard treated the Summer Associate position as a working job interview, and the position typically ends with an End of Summer Review where it decides whether to offer the Summer Associate a position as an Associate Attorney following the completion of their final year of law school and subsequent bar exam passage.

13. On 8/10/2018, Ms. Christensen had an O.C.I. with Jane Hahn and David Van Dyke from Howard & Howard and was subsequently invited for a call-back interview on 8/27/2018.

14. Throughout the O.C.I. and her call-back interview, Ms. Christensen stated that her professional interests included data and intellectual privacy law.

15. On 9/12/2018, Ms. Christensen was offered and accepted a Summer Associate position at Howard & Howard's Chicago office, which was scheduled to begin on 5/20/2019.

16. Ms. Christensen was one of three Summer Associates in the Chicago office during the summer of 2019. The other two Summer Associates were both males.

17. On reason and belief, Ms. Christensen was the only female Summer Associate to be employed by Defendant Howard & Howard for a period of at least eight (8) years.

B. **Ms. Christensen Was Subjected To Gender Discrimination**

18. Upon beginning her Summer Associate position with Howard & Howard, Ms. Christensen was immediately subjected to a culture of gender discrimination and bizarre bullying tactics by the firm. Specifically, on 5/22/2019, during Ms. Christensen's first week of employment, Ms. Hahn informed Ms. Christensen that she "liked [her] now much better than [she] did during the interview process" and that she had initially shown a preference for another Notre

Dame candidate who was a male because "[She] was worried [Ms. Christensen] would be 'too competitive.'"

19. In addition to this gender-stereotypical comment, in the first week of her employment, Ms. Christensen noticed the scarcity of female attorneys at the firm. At the time she worked for Howard & Howard, Ms. Christensen observed that, although there were six female attorneys in total at the Chicago office, all but one (Ariane Janz) were partners and that, on any given day, only 2-3 other females were present in the office, compared to over 30 male attorneys.

20. On or about 6/12/2019, less than a month into her employment, Howard & Howard's attorney Jude Sullivan told Ms. Christensen that she was a good fit at Howard & Howard because she was "like a dude in heels." On at least three occasions during her employment, different Howard & Howard attorneys told Ms. Christensen to avoid Mr. Sullivan because he is "our H.R. liability."

21. On 8/2/2019, the culture of gender-discrimination continued when Sr. Partner Robert Ambrose asked Ms. Christensen to lunch. While at lunch Mr. Ambrose indicated that he was avoiding being present at the office because his secretary was about to be fired and then directed Ms. Christensen to go onto the street and "take photos of the girls going to Lollapalooza" (a concert event that typically attracts many young females) so he could send those photos to a friend of his.

22. In addition to these overt acts, Ms. Christensen was treated hostilely throughout her internship by Miram Burkland. Ms. Burkland, Firm Counsel and a

leading partner at Howard & Howard, was assigned to be Ms. Christensen's mentor. Howard & Howard's website description for the Summer Associate position stated that Summer Associates are matched with a mentor/supervising Attorney who "provides constructive feedback to help improve their skills." However, in stark contrast to the website, Ms. Burkland never once sought out Ms. Christensen to check in, offer counsel, advise, or even initiate a casual conversation. Throughout the summer, Ms. Burkalnd never provided meaningful feedback. Instead, she chose to repeatedly provide bitter, negative, and underserved comments, paired with suggestions that Ms. Christensen might not be competent enough to complete the work at hand. Moreover, Ms. Burkland often refused to acknowledge Ms. Christensen's presence or return a hallway greeting.

23. For example, on 7/15/2019, after receiving a stack of papers on her desk with a note that simply read "come see me - MLB," (i.e., Miriam Burkland) Ms. Christensen approached Ms. Burkland's office hoping to receive assignment details. After inquiring if Ms. Burkland had time, Ms. Burkland responded, "No," and continued typing on her computer.

24. Additionally, on repeated occasions, Ms. Christensen arrived at her office to find a stack of papers on her desk, with a stick note which merely said "MLB" and with no instruction as to what her assignment was.

25. On another occasion during her internship, Ms. Burkland instructed Ms. Christensen to "review" thousands of printed pages of documents, with no other instructions. Shortly thereafter, Ms. Burkland "expressed disappointment" at a typo on a single document and pointed at one of the hundreds of dates on

another page, a page which Ms. Burkland had instructed Ms. Christensen to ignore, and stated "I looked up the date (e.g., Tuesday, March 15, 1982), it was a Monday, not a Tuesday. I was expecting you to pick up on this stuff. That is the entire reason I gave you this assignment to begin with."

26. Much like her dismissive behavior in person, Ms. Burkland also disregarded and did not respond to countless emails sent by Ms. Christensen.

### C. Ms. Christensen Had Nowhere To Turn

27. Ms. Christensen had no place to voice her complaints of discrimination and hostility. Howard & Howard's employee website stated that "any employee with concerns about discrimination in the workplace is encouraged to bring these issues to the attention of the Firm's Director of Human Resources, Firm Counsel, or C.E.O."

28. However, Howard & Howard does not have a "Director of Human Resources" or any single individual with this role. Office Manager Phillip Crivellone explicitly articulated to Ms. Christensen early on in the summer that he did not handle conflicts on the legal side of the office.

29. Further, Mary Dirkes, perhaps the closest example of a human resource person for the Summer Associates, stated in one of her earliest emails to Ms. Christensen that Ms. Burkland was a "close friend" and would "be a fantastic mentor." As such, Ms. Dirkes obviously could not help Ms. Christensen navigate Ms. Burkland's hostilities in an unbiased fashion.

30. Finally, there can be little expectation of a Summer Associate approaching Howard & Howard's C.E.O., Mark Davis, whom she had only met once briefly and who worked in an office in a different state.

### D. Ms. Christensen Performed Admirably

31. Despite being treated with hostility and despite having no functional H.R. structure in place to voice her complaints, Ms. Christensen performed highly during her employment. Ms. Christensen forged solid relationships with many Attorneys, produced high caliber work that was relied upon and published by the firm, and was assured by many that she was creating a work-product worthy of an offer for a full-time position at the end of the summer. In fact, toward the end of her employment, Mr. Levin expressed that he had "only heard good things around the office" about Ms. Christensen.

32. Numerous attorneys expressed thanks to Ms. Christensen during her employment for help on projects including Justin Gingerich, Jeff Barclay, Chase Hundman, Michael Lied, and Leo Aubel. In fact, at an office meeting, in front of a group of over a dozen Attorneys, Mr. Aubel told the group a story about how he had recently gone to Court with an excel chart Ms. Christensen created for him and, upon noticing her chart, the Court Clerk remarked about how good it was and asked for a copy. Mr. Aubel expressed gratitude for such a helpful and color-organized sheet and requested an additional print-out since the Clerk had taken his only copy.

33. Additionally, Howard & Howard posted an article that Ms. Christensen authored on the office web-page/blog and shared it multiple times on

LinkedIn (credit for the article was given to one of the firm's Partners, Mr. Michael Lied who received the article from Ms. Christensen and did not change anything whatsoever prior to the article's publication).

### E. Howard & Howard Terminates Ms. Christensen And Denys Her Future Employment For Pretextual Reasons

34. On 8/5/2019, at her End of Summer Review conducted by Ms. Burkland, Ms. Christensen was informed that she was terminated from her Summer Associate position (three days before it was scheduled to end) and that she would not be receiving an offer for full-time employment as an Associate.

35. Howard & Howard's reasons for these two decisions were: poor work quality, incomplete projects, and because the firm had no interest in going into data privacy.

36. All three of these reasons are pretextual.

#### i. Pretextual Reason 1: Poor Work Quality

37. Ms. Burkland is the only Howard & Howard employee who rated Ms. Christensen's work quality as poor. To that end, Ms. Burkland's examples of this poor performance are limited to a single typo and an incorrect date that was not caught on a document that Ms. Christensen was instructed to ignore. Significantly, other than these two minor critiques, Ms. Christensen received no written admonishment regarding her work or other behavior throughout the entire internship.

38. On the contrary, Ms. Christensen's work product was praised explicitly by other attorneys in the firm, and an article she drafted was published to the firm's website.

### ii. Pretextual Reason 2: Incomplete Projects

39. To support her allegation of incomplete projects, in the termination meeting, Ms. Burkland offered only that the unfinished work product referred to a single project due to Mary Corrigan, "which was never received." However, Ms. Corrigan was clear in writing that Ms. Christensen had until her last day to complete the project. Ms. Christensen had corresponded with Ms. Corrigan at least twice during the summer to assure her that the project was in progress and that it would be completed by her last day. Ms. Corrigan confirmed the same was acceptable. The project was in progress, and its due date had not passed at the time Ms. Burkland asserted that Ms. Christensen had not completed the work.

### iii. Pretextual Reason 3: Howard & Howard's Practice of Data Privacy Law

40. Howard & Howard's assertion that it had no interest in Data Privacy Law is also pretextual.

41. Ms. Christensen expressed interest in pursuing data law to Howard & Howard, including on her resume submitted for O.C.I. (including mention of interest in GDPR and biometric scanning) and during her call-back interview where, in multiple rounds of interviews, she outlined the GDPR and data privacy

work that she had completed during her 1L Summer Associate position at JetBlue Airways.

42. Because the intention of hiring a Summer Associate is to determine whether to offer that person an Associate Attorney position, if Howard & Howard had not been interested in practicing Data Privacy Law, it defies logic that it would hire Ms. Christensen as a Summer Associate.

43. Additionally, at the time it terminated Ms. Christensen, Howard & Howard's website expressly indicated that it practiced Data Privacy Law. Specifically, its website, which was updated approximately one month before Ms. Christensen's termination, added an entirely new practice area titled "Data Privacy & Cybersecurity." Within this new practice area section, Howard & Howard states that the firm has "built a team of attorneys with training and experience in data privacy in the United States and abroad, who can help businesses stay compliant with the rapidly changing legal environment."

44. The newly created page also adds that Howard & Howard represents "the industries that find themselves on the front lines of cyber threats and data theft risks" and that the [Howard & Howard] works to "anticipate, address, avoid, and mitigate risk" through services including data breach crisis management, transnational transfers of data, and drafting of internal privacy policies. Finally, the page notes that, through "forming a comprehensive team," Howard & Howard is "able to provide guidance with laws both at home and abroad." The page concludes with a sentence reading, "Privacy compliance is no longer a luxury, it is a legal

necessity. Clients depend on data privacy and cyber-security attorneys at Howard & Howard to help navigate today's complex compliance landscape."

45. At the same time, it updated its website to include "Data Privacy & Cybersecurity," Howard & Howard also changed its "General IP" section to include the fact that it included a group of lawyers counseling and providing representation on topics including "privacy and publicity rights."

46. At the same time it updated its website to include "Data Privacy & Cybersecurity," Howard & Howard also changed its website to add a Financial Institutions Section indicating Howard & Howard's "dynamic, cross-functional team of business and corporate […] data privacy […] and tax attorneys […who] not only ensure that transactions adhere to the letter and spirit of the law, but also bring creative solutions to the table."

47. At the same time it updated its website to include "Data Privacy & Cybersecurity," Howard & Howard also changed its website to add a Media Section featuring Howard & Howard attorneys commenting on and contributing to a wide range of privacy-related news articles including topics such as privacy regulations, the impact of cell phone selfies on privacy concerns, the Employee Credit Privacy Act, privacy law court rulings, and annual privacy notice changes.

**F. Howard and Howard Changed its Justification for Terminating/Denying Employment to Ms. Christensen in its Position Statement**

48. The reasons cited by Howard and Howard for the termination and denial of employment to Ms. Christensen are demonstrably false.

49. In its position statement to the U.S. Equal Employment Opportunity Commission, Defendant Howard and Howard presented an entirely different set of justifications for why it terminated and denied employment to Ms. Christensen, including altogether new references to:

   a. Ms. Christensen "not being committed to building her career with Howard and Howard."

   b. Ms. Christensen "unprofessional behavior at a firm event."

   c. Ms. Christensen expected too much from her mentor.

   d. Ms. Christensen "improper alteration of treatise citation style."

   e. Ms. Christensen "failed to meet reasonable expectations or engage in the type of professional behavior expected of a summer associate."

   f. Ms. Christensen was "not proactive with respect to actual work assignments and soliciting feedback."

50. These new justifications offered subsequently and in contrast to the initially provided justifications at the time of Ms. Christensen's wrongful termination and denial of employment are all false and, therefore, pretextual.

   G. **Similarly Situated Male Interns Were Treated Differently**

51. Unlike Ms. Christensen, the two male Summer Associates were offered full-time employment.

52. The two male Summer Associates were offered full-time employment notwithstanding the fact that, during their summer experiences, both of these male employees had received written and verbal admonishments for a range of problems, including unacceptable work and failure to integrate socially.

53. Specifically, one male Summer Associate received an admonishment in writing that his work product was "completely unacceptable." On another occasion, he had been sternly admonished at a firm social outing for making no effort to engage socially. Additionally, he did not pass the Illinois bar on first attempt, but was kept on for a year as intern until he finally passed.

54. This male was treated in stark contract with Ms. Christensen.

**H. Howard & Howard's Behavior Cause Harm To Ms. Christensen**

55. Failing to secure an offer of future employment for a Summer Associate is exceptionally harmful.

56. Failing to secure an offer of future employment for a Summer Associate is a rare event at Howard & Howard. Ms. Hahn told Ms. Christensen that she can recall only two Summer Associates not receiving an offer during her tenure. In those instances, it was clear very early on that the Summer Associate was not a good fit.

57. Failing to secure an offer of future employment for a Summer Associate at Howard & Howard is a fact that becomes known generally in the legal community.

58. The shame and reputational black eye associated with failing to secure an offer of future employment for a Summer Associate at Howard & Howard resulted in considerable reputational damage in Chicago and Notre Dame's tight-knight legal communities.

59. To this end, Defendant Howard & Howard Partner Scott Levin has recently suggested that Ms. Christensen pursue other career paths rather than applying to law firms in Chicago.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Sexual Harassment in Violation of Title VII**

60. Plaintiff hereby incorporates Paragraphs 1 through 59 as though fully alleged herein.

61. Ms. Christensen was subjected to inappropriate sexual behavior at Defendant Howard and Howard's Chicago Office.

62. The inappropriate sexual behavior was unwelcome and offensive.

63. The inappropriate sexual behavior was directed at Ms. Christensen because of her gender.

64. The inappropriate sexual behavior was sufficiently severe and pervasive to alter the conditions of Ms. Christensen's employment by creating a hostile work environment.

65. Defendant Howard and Howard and its agents knew or should have known of the inappropriate sexual behavior and failed to take prompt and corrective remedial action.

66. Defendant's actions were willful and wanton and done with reckless disregard for Ms. Christensen's protected rights.

67. As a result of Defendant's behavior, Ms. Christensen has suffered damages.

## SECOND CLAIM FOR RELIEF
### Sex Discrimination in Violation of Title VII

68. Plaintiff hereby incorporates Paragraphs 1 through 67 as though fully alleged herein.

69. As a woman, Ms. Christensen is a member of a protected class.

70. During her employment, Ms. Christensen was subjected to gender discrimination, including being subjected to a hostile work environment and adverse actions, including but not limited to, harassment, humiliation, and meaningless tasks and being terminated.

71. Ms. Christensen was treated less favorably than her male counterparts.

72. The hostile work environment and adverse actions taken against Ms. Christensen were motivated by her gender.

73. Defendant's actions, as described herein, were willful and wanton and done with reckless disregard for Ms. Christensen's protected rights.

74. As a result of Defendant's discriminatory conduct, Ms. Christensen has suffered damages.

## FOURTH CLAIM FOR RELIEF
### Denial of Employment in Violation of Title VII

75. Plaintiff hereby incorporates Paragraphs 1 through 74 as though fully alleged herein.

76. As a woman, Ms. Christensen is a member of a protected class.

77. During her employment, Ms. Christensen was subjected to gender discrimination, including being subjected to a hostile work environment and adverse actions, including but not limited to, harassment, humiliation, and meaningless tasks and being terminated.

78. Ms. Christensen was treated less favorably than her male counterparts.

79. The hostile work environment and adverse actions taken against Ms. Christensen were motivated by her gender.

80. Ms. Christensen was denied employment as a result of her gender.

81. Defendant's actions, as described herein, were willful and wanton and done with reckless disregard for Ms. Christensen's protected rights.

82. As a result of Defendant's discriminatory conduct, Ms. Christensen has suffered damages.

**WHEREFORE** Plaintiff Christensen respectfully requests that this Court enter judgment in her favor and against the Defendants an award

1. injunctive and declaratory relief;
2. damages in such an amount as shall be proven at trial for back-pay and damages including lost benefits, wages, promotions, tenure, seniority, other employment opportunities, and contract damages;
3. an order for the Defendant to reinstate Ms. Corio or in the alternative to pay front-pay and benefits, including lost benefits in an appropriate amount;
4. compensatory damages, including emotional distress as allowed by law;
5. punitive damages under Title VII;
6. attorney's fees and costs as provided for by law;
7. pre- and post-judgment interest, costs, expert witness fees; and
8. such other relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES.**

Respectfully Submitted:
**Patricoski Law Offices**

_____
Mark G. Patricoski
one of plaintiff's attorneys

Patricoski Law Office
Mark G. Patricoski
Gregory A. Patricoski
1755 S. Naperville Rd. #206
Wheaton, Illinois 60189
Office (630)-933-8000
Fax: (630) 933-8000
mark@markpatlaw.com